**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

VICTOR WAYNE CHAVEZ-MCCOMBS and ALICIA MCCOMBS, individuals, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAFECO INSURANCE COMPANY OF AMERICA, LIBERTY MUTUAL GROUP, INC., a Massachusetts corporation, LIBERTY MUTUAL HOLDING COMPANY, INC., a Massachusetts-based holding company, LIBERTY MUTUAL INSURANCE COMPANY, and all affiliated Liberty Mutual entities,

Defendants.

**Case No. 3:26-cv-30092-MGM**

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. Introduction ..... 5

II. Parties ..... 7

A. Plaintiffs ..... 7

B. Defendants ..... 7

III. Jurisdiction and venue ..... 11

IV. Facts ..... 12

A. Liberty Mutual is obligated to pay general contractor's overhead and profit, or O&P. ..... 12

B. Liberty Mutual's ACV and RCV payments to Class and Subclass members using the RCLD Methodology omit sales taxes from the O&P calculation. ..... 14

1. Liberty Mutual's failure to apply O&P on taxes is intentional, willful, and in bad faith. ..... 18

2. Other insurance companies apply O&P to taxes. ..... 19

3. Liberty Mutual breached its Covered Contract with the McCombs. ..... 22

C. Post-filing developments ..... 24

V. Alter ego allegations ..... 24

VI. Class action allegations ..... 26

A. Class definition. ..... 26

B. The Class and Subclasses satisfy Rule 23 ..... 28

1. Numerosity ..... 28

2. Commonality ..... 28

3. Typicality ..... 28

4. Adequacy of representation ..... 29

5. Predominance and superiority ..... 29

VII. Claims for relief ..... 30

Count I – Breach of contract ........ 30

1. Alabama ........ 31

2. Arizona ........ 31

3. Arkansas ........ 32

4. Colorado ........ 32

5. Florida ........ 33

6. Illinois ........ 33

7. Indiana ........ 34

8. Kansas ........ 34

9. Kentucky ........ 35

10. Mississippi ........ 35

11. Missouri ........ 35

12. North Carolina ........ 36

13. Ohio ........ 37

14. Texas ........ 37

15. Damages (all Subclasses) ........ 38

Count II – Violation of state consumer protection laws ........ 38

1. Arizona ........ 39

2. Arkansas ........ 39

3. Colorado ........ 39

4. Florida ........ 40

5. Illinois ........ 40

6. Kansas ........ 41

7. Kentucky ........ 41

8. Missouri ........ 41

9. North Carolina ..... 41

10. Ohio ..... 42

11. Texas ..... 42

12. Damages (all Subclasses – Count II). ..... 42

Count III – Bad faith ..... 42

1. Alabama ..... 43

2. Arizona ..... 43

3. Arkansas ..... 44

4. Colorado ..... 44

5. Illinois ..... 45

6. Indiana ..... 46

7. Kansas ..... 46

8. Kentucky ..... 47

9. Mississippi ..... 47

10. North Carolina ..... 48

11. Ohio ..... 48

12. Texas ..... 49

13. Damages (all Subclasses – Count III). ..... 49

Count IV - Declaratory judgment and relief ..... 49

VIII. Prayer for relief ..... 50

IX. Jury demand ..... 51

Victor Wayne Chavez-McCombs and Alicia McCombs ("Plaintiffs" or "the McCombs"), individually and on behalf of a class of similarly situated persons, based on their personal knowledge as to themselves and their own acts, and based on information and belief and counsel's investigation as to all other matters, sue Safeco Insurance Company of America, Liberty Mutual Group, Inc., and Liberty Mutual Holding Company, Inc. (together, and in combination with other entities identified below, "Liberty Mutual" or "Defendants"), as follows:

## I. INTRODUCTION

1. This class action concerns Liberty Mutual's calculation of a key component of property damage insurance claims, namely overhead and profit ("O&P"), which is part of the cost to repair or replace damaged property when the complexity is such that a general contractor's services are required. Specifically, it concerns Liberty Mutual's policy, practice, and pattern of calculating O&P before taking sales taxes on materials into consideration, rather than after. It seeks a determination that Liberty Mutual's conduct in this regard breaches both the terms of its contracts as well as industry standards. It does not seek a determination of any other question, and does not allege any wrongful conduct. It does not, for example, seek a determination about the propriety of the sales tax percentage used by Liberty Mutual in connection with any estimate provided to the Plaintiffs or anyone else; the price, value, quantity, or scope of either materials (*e.g.*, a shingle or gutter), labor (*e.g.*, a roofer or electrician), or equipment (*e.g.*, air condenser), in any such estimate; or, indeed, anything other than the question of whether it is proper to calculate O&P before taking sales taxes on materials into consideration, or whether, as Plaintiffs allege, O&P should be calculated after doing so.

2. As background, insurance companies like Liberty Mutual generally pay property damage insurance claims pursuant to contractually defined values called "actual cash value"

("ACV") or "replacement cost value" ("RCV"). As relevant here, the only difference is that ACV accounts for depreciation—that is, the reduction in value due to age, wear and tear, etc.—while RCV does not. For example, suppose a roof with a 30-year expected life is destroyed in year 25 and would cost $100,000 to replace. ACV accounts for the fact that the roof only had 5 years of life left, and is calculated as $100,000 minus 25 years' worth of depreciation (25/30 of the replacement cost, or about $83,333), or roughly $16,667. ACV thus equals replacement cost less depreciation ("RCLD" or "RCLD Methodology"). Whether a policy calls for ACV or RCV depends on what the insured paid for, with premiums for RCV coverage costing more, all else equal. Regardless, both ACV and RCV include the cost to repair or replace the damaged property as part of the calculation.[1]

3. As for O&P, it is a component of that cost when the complexity is such that a general contractor's services are required, and it represents the price of those services. Liberty Mutual and other insurers calculate O&P as a 20 percent markup (10% for overhead and 10% for profit) of the costs to make repairs.

4. While the longstanding industry custom, standard, and tradition has been to calculate O&P *after* sales taxes, in recent years, Liberty Mutual has surreptitiously begun to calculate O&P *before* sales taxes, resulting in the systematic underpayment of property insurance claims. It has done so under property insurance policies that Liberty Mutual drafted, and that uniformly require Liberty Mutual to pay the policyholder the cost to repair or replace the damaged property, either on an ACV basis or an RCV basis. It has done so intentionally, willfully, with no justification, and in bad faith.

---

[1] Where an insurance contract calls for RCV, insurance companies like Liberty Mutual will initially pay the policyholder the ACV, while withholding depreciation, and will "release" the depreciation, and thus pay the full RCV, once the policyholder completes the repair.

5. Plaintiffs bring this action on behalf of themselves and all others similarly situated to recover damages caused by Liberty Mutual's breaches and to enjoin those breaches.

## II. PARTIES

### A. Plaintiffs

6. Plaintiffs Victor Wayne Chavez-McCombs and Alicia McCombs are residents and citizens of the State of Colorado.

### B. Defendants

7. Defendant Liberty Mutual Holding Company, Inc. ("LM Holding Company") is a mutual holding company organized under the laws of Massachusetts. Defendant LM Holding Company is the ultimate parent corporation at the top of a vast vertical mutual holding company structure under which it, through its various downstream insurance subsidiaries and affiliates, provides consumers and businesses property and casualty insurance services.

8. LM Holding Company, through its majority and wholly owned subsidiaries and affiliates, collectively operates under the "Liberty Mutual" brand name to conduct, as is pertinent to this lawsuit, two primary strategic business units: (1) US Retail Markets ("USRM"); and (2) Global Risk Solutions ("GRS"). LM Holding Company's USRM unit provides homeowners, renters, and other personal and small commercial lines property and casualty insurance to individuals and small businesses throughout the United States. Similarly, the ultimate parent corporation's GRS unit delivers commercial and specialty insurance, as well as reinsurance, to mid-size and large businesses worldwide, including within the United States.

9. Functionally, LM Holding Company does not conduct its primary business operations. Rather, it acts as a holding company where it owns some or all the assets and stocks of its majority and wholly owned downstream subsidiaries and affiliates, which perform its USRM and GRS business operations.

10. Defendant Liberty Mutual Group, Inc. ("LM Group") is a stock holding company organized under the laws of Massachusetts which is a direct, wholly owned subsidiary of its parent company, LMHC Massachusetts Holdings Inc. ("LMHC-MA"), a Massachusetts stock holding company. In turn, LMHC-MA is a direct wholly owned subsidiary of the ultimate parent company, LM Holding Company.

11. Defendant LM Group is the direct parent of several wholly owned stock insurance subsidiaries which have common ownership under the ultimate parent company, Defendant LM Holding Company. These insurance subsidiaries provide insurance services, including underwriting and issuing property and casualty insurance products to consumers and businesses nationwide, and include (1) Defendant Liberty Mutual Insurance Company ("LMIC"), an insurance company organized under the laws of Massachusetts; (2) Liberty Mutual Fire Insurance Company, a Massachusetts-based corporation; (3) Employers Insurance of Wausau, a Wisconsin-based corporation; (4) Liberty Mutual Personal Insurance Company, a Massachusetts-based corporation; (5) State Automobile Mutual Insurance Company, an Ohio-based corporation; (6) Liberty Mutual Mid-Atlantic Insurance Company, a Massachusetts-based corporation; and (7) Patrons Mutual Insurance Company of Connecticut, a Connecticut-based corporation (at times, collectively, the "Member Insurers"). As a result of the restructuring of the Member Insurers in the holding company system, policyholders of the Member Insurers are members of and have equity rights in the ultimate parent company, LM Holding Company.

12. Defendant LMIC serves as an upstream parent company to numerous majority or wholly owned stock property and casualty insurance company subsidiaries, which are wholly owned by the ultimate parent company, Defendant LM Holding Company, through its vertical mutual holding company structure over all downstream subsidiaries and affiliates (at times,

collectively, the "LMIC Insurer Tree"). The LMIC Insurer Tree includes: (1) Peerless Insurance Company, a New Hampshire-based corporation and its wholly owned subsidiaries; (2) Ironshore Specialty Insurance Company, an Arizona-based corporation; (3) Liberty Personal Insurance Company, a New Hampshire-based corporation; (4) Wausau Business Insurance Company, a Wisconsin-based corporation; (5) Wausau General Insurance Company, a Wisconsin-based corporation; (6) America First Lloyd's Insurance Company, a Texas-based corporation; (7) Indiana Insurance Company, an Indiana-based corporation; (8) Safeco Lloyds Insurance Company, a Texas-based corporation; (9) American States Lloyds Insurance Company, a Texas-based corporation; (10) Ohio Casualty Insurance Company, a New Hampshire-based corporation; (11) American Fire & Casualty Company, a New Hampshire-based corporation; (12) Consolidated Insurance Company, an Indiana corporation; and (13) West American Insurance Company, an Indiana corporation. Ohio Casualty Insurance Company's direct parent company, Ohio Casualty Corporation, is owned by four insurance corporations wholly owned by LM Holding Company under its vertical mutual holding structure.[2]

13. Defendant Safeco Insurance Company of America ("Safeco") is a stock insurance corporation organized under the laws of New Hampshire. Safeco's outstanding shares of capital stock are wholly owned by Safeco Corporation, a Washington-based insurance holding company which is wholly owned by its direct parent, Liberty Mutual Agency Corporation ("LMAC"), a Delaware-based insurance holding company. In turn, LMAC is wholly owned by Liberty Insurance Holdings, Inc., a Delaware-based insurance holding company, which is wholly owned by Defendant LMIC, the ultimate parent company of which is LM Holding Company.

---

[2] 8% owned by Peerless Insurance Company, 8% owned by Employers Insurance Company of Wausau, 6% owned by Liberty Mutual Fire Insurance Company, and 78% owned by Defendant LMIC.

14. Safeco is one of a wide array of stock insurance subsidiaries positioned downstream to a holding company system where Safeco Corporation acts as a direct upstream parent and LM Holding Company is the ultimate controlling parent (at times, collectively, the "Safeco Corporation Insurer Tree"). Insurers falling under the Safeco Corporation Insurer Tree include: (1) American Economy Insurance Company, an Indiana-based corporation; (2) American States Preferred Insurance Company, an Indiana-based corporation; (3) American States Insurance Company, an Indiana-based corporation; and (4) General Insurance Company of America, a New Hampshire-based corporation.

15. The Safeco Corporation Insurer Tree and the LMIC Insurer Tree (at times, collectively, the "LM Mutual Insurers") have no equity rights in LM Holding Company. However, LM Holding Company controls the board members of all LM Mutual Insurers and their subsidiary insurers.

16. Defendant LM Group acts as a subsidiary of the ultimate parent company, Defendant LM Holding Company.

17. Defendant LM Holding Company uses various "Liberty Mutual" trade names and trademarks, including without limitation "Liberty Mutual Insurance," "Liberty Mutual Insurance Group," "Liberty Mutual Personal Markets," "Liberty Mutual Surety," "A Liberty Mutual Insurance Company," "Liberty International," "Safeco Insurance," "Ironshore," "State Auto," and similar types of names as may be adopted from time to time in conducting its business of underwriting property insurance policies to consumers and businesses nationwide through its Member Insurers, LM Mutual Insurers and their various insurer subsidiaries and affiliates.

18. Whenever it is alleged in this Complaint that Liberty Mutual or the named Defendants did any act or thing, it is meant that Liberty Mutual, its Member Insurers, its LM

Mutual Insurers and all subsidiary and/or affiliated insurance companies under its mutual holding system, and their agents, officers, servants, employees, or representatives did such act or thing, and when such act or thing was done, it was done with full authorization or ratification of the named Defendants or was done in the normal and routine course and scope of business, or with the actual, apparent and/or implied authority and control of LM Group, LM Holding Company, or LMIC.

19. Liberty Mutual underwrites and procures property and casualty policies through its wholly owned independent agency, Comparion Insurance Agency, a Massachusetts-based corporation, and other exclusive independent agents.

20. Liberty Mutual, through its vast network of wholly owned corporate entities and state-licensed insurance subsidiaries, tailors and customizes baseline policy forms using state-by-state amendatory endorsements to align with state laws.

## III. JURISDICTION AND VENUE

21. This Court has jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds $5,000,000 and where at least one member of the proposed Class is a citizen of a state different from at least one of the Defendants.

22. Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, in that Liberty Mutual is headquartered in this district, and in that the challenged policies and practices relating to O&P were devised at Liberty Mutual headquarters in this district.

23. Venue is also appropriate under 28 U.S.C. § 1391(b)(3) because at least one of the Defendants is subject to the Court's personal jurisdiction with respect to this action, in that LM Holding Company, LM Group, LMIC, and LMHC-MA are headquartered in this judicial district,

have their principal places of business in this district, and are incorporated in this district, such that this Court has general personal jurisdiction over them.

## IV. FACTS

### A. Liberty Mutual is obligated to pay general contractor's overhead and profit, or O&P.

24. Liberty Mutual issues property and casualty ("P&C") insurance policies in numerous states through several subsidiaries and affiliates organized within its mutual holding structure, including Safeco. As relevant here, those policies require Liberty Mutual to pay Class and Subclass members the amount it would cost to repair or replace the damaged structure using an RCLD Methodology described herein ("Covered Losses" [3]). The policies at issue are all materially identical in that their policy forms define ACV and/or RCV in a manner requiring Liberty Mutual to pay Covered Losses using the RCLD Methodology, and do not explicitly contain language permitting Liberty Mutual to omit material sales taxes ("sales taxes") from the O&P calculation. Specifically, these policies, which will be referred to as the "Covered Contracts," all share the following attributes:

- They were drafted by Liberty Mutual using standard policy forms created and tailored by Liberty Mutual to comply with individual state laws;
- They contain state-specific policy forms which require Liberty Mutual to pay Covered Losses using the RCLD Methodology based on a definition of ACV and/or RCV which requires the amount it would cost to repair or replace the damaged property on Covered Losses either with or without depreciation, and do not explicitly allow Liberty Mutual to omit sales tax;

[3] As used here, Covered Losses refers only to damage to a structure, and not, for example, to damage to personal property within a structure.

- They do not contain any language explicitly permitting Liberty Mutual to omit sales taxes from the O&P calculation.

25. As for O&P, as Liberty Mutual's communications to Class and Subclass members explain, under the Covered Contracts, O&P is an amount to be paid "when the complexity of a repair or replacement requires a general contractor." *See* Fig. 1. O&P is thus a component of the amount necessary to repair or replace damaged property in those circumstances when a loss requires repairs or replacements that are sufficiently complex to justify hiring a general contractor.



# Understanding your building estimate

Property Claims

Liberty Mutual. INSURANCE | Safeco Insurance. A Liberty Mutual Company

We want to make understanding your property claim as easy as possible. This sample estimate will help explain how we calculate your total payment.

## 1 Understanding line item details

Let's take a look at damages to the building. However, based on your specific loss, your property claim estimate could also include other structures like a detached garage or inground pool.

### Sample estimate

| Description | Quantity | Unit Price Per | Total O&P | Total Taxes | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|
| 1. Switch Only | 4 | $18.36 EA | $14.76 | $0.41 | $88.61 | $42.53 ✓ | $46.08 |
| 2. Outlet/Receptacle Telephone | 1 | $21.97 EA | $13.38 | $0.96 | $80.25 | $38.52 ✓ | $41.73 |
| 3. Outlet/Receptacle Duplex | 8 | $18.09 EA | $36.36 | $0.87 | $218.13 | $104.71 ✓ | $113.42 |
| 4. Ceiling/Paddle Fan Good | 1 | $375.16 EA | $76.58 | $7.65 | $459.39 | $22.96 ✓ | $436.43 |
| 5. Carpet, Wall to Wall, Good | 534.01 | $3.17 SF | $93.34 | $20.52 | $560.04 | $168.01 ✓ | $392.03 |
| 6. Carpet Pad, Good | 415.80 | $0.65 SF | $112.98 | $27.29 | $677.87 | $203.37 ✓ | $474.50 |
| 7. Drywall, Wall 1/2", Taped | 678.40 | $1.78 SF | $614.50 | $52.93 | $3,687.06 | $294.96 ✓ | $3,392.10 |
| 8. Prime & Paint - Drywall/Plaster Wall | 616.66 | $1.00 SF | $342.54 | $16.29 | $2,055.25 | $548.06 ✓ | $1,507.19 |
| 9. Base Molding, Paint Grade | 84.80 | $2.58 LF | $56.72 | $7.07 | $340.29 | $22.68 ✓ | $317.61 |
| 10. Prime & Paint - Base | | | | | | | |

**Term key:**

**Quantity**
Amount of material or time needed.

**Unit Price**
Cost of material, labor, or equipment for each unit.

**(Total O&P) Overhead and Profit**
Overhead and profit is included in a repair estimate when the complexity of repair or replacement requires a general contractor.[1]

**(RC) Replacement Cost value**
What you would pay to replace the item at today's cost: Quantity x Unit Price + Tax + Overhead and Profit.

**Depreciation**
Reduction in value of property over time due to age, use, and condition of item. Depending on your policy, some depreciation may be recoverable (or reimbursable). Recoverable depreciation is represented with a blue check mark to the right of the depreciation amount.

**(ACV) Actual Cash Value**
What you would pay for the item at today's cost minus depreciation: Replacement Cost Value – Depreciation.

***Fig. 1***

26. The industry standard amounts for O&P, which Liberty Mutual abides by, are 10% for overhead and 10% for profit. *E.g.*, *United States v. Sharp*, 749 F.3d 1267, 1272 (10th Cir. 2014) (noting that the practice of adding "10% for overhead and 10% for profit, [for] a total of 20% markup[,] . . . was known and generally agreed to by insurers and was standard in the industry"); *Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co. of Hartford*, 880 F.2d 575, 578 n.5 (1st Cir. 1989) ("To make the computation, one calculates direct repair costs, adds thereto a 10% markup for overhead, reaches a new subtotal, and adds a further 10% markup representing the contractor's hypothetical profit."). *See also* Fig. 2 (Liberty Mutual estimate applying 20% O&P).

Safeco Insurance

**Safeco Insurance Company**
PO Box 5014
Scranton, PA 18505-5014
Fax: (888) 268-8840

**ESTIMATE:** Structure — Claim [redacted]
Completed

| | |
|---|---|
| Total Materials: | $23,645.26 |
| Total Labor: | $21,576.70 |
| Total Equipment: | $140.04 |
| **Subtotal:** | **$45,362.00** |
| State 2.900% (applies to materials only, some items overridden): | $689.81 |
| City 3.460% (applies to materials only, some items overridden): | $822.96 |
| County 0.500% (applies to materials only, some items overridden): | $118.93 |
| Special 1.100% (applies to materials only, some items overridden): | $261.63 |
| Add 10.00% overhead: | $4,536.21 |
| Add 10.00% profit: | $4,536.21 |
| **Replacement Cost Value:** | **$56,327.75** |

***Fig. 2***

**B. Liberty Mutual's ACV and RCV payments to Class and Subclass members using the RCLD Methodology omit sales taxes from the O&P calculation.**

27. It is the industry standard, custom, and tradition to include O&P on sales taxes. For example, Verisk is the provider of Xactimate, the leading and most widely used software for estimating property insurance claims. In a document explaining how Xactimate treats the interaction between sales taxes and O&P, Verisk explains that the software's default setting "includes the sales tax amount in the base calculation of the overhead and profit (i.e. applies

O&P to sales tax)," and that default setting is "based on general industry guidelines and/or tradition[.]" The reason O&P is calculated on top of sales taxes is because such taxes are part of a general contractor's hard costs, and thus part of the base upon which O&P percentages should be calculated.

28. Liberty Mutual's own explanation of its contractual obligations confirms such industry standard. In Fig. 1 above, for example, Liberty Mutual provides a formula for calculating the cost it would take to repair or replace a covered structure: "Quantity x Unit Price + Tax + Overhead and Profit." Liberty Mutual further explains that "Unit Price" as used in this formula is the "Cost of material, labor, or equipment for each unit." Thus, Liberty Mutual's own understanding of its contractual obligations is that O&P should be calculated *after* taking sales taxes, materials, labor, and/or equipment into consideration.

29. In fact, before the second half of 2022 and consistent with the formula explained in Fig. 1, Liberty Mutual routinely applied O&P on top of sales taxes.

30. Around June or July 2022, however, Liberty Mutual began systematically omitting sales taxes from O&P.

31. Liberty Mutual's shift coincided with its company-wide move away from using the Xactimate estimating software to using its new estimating platform.

32. On October 19, 2020, Liberty Mutual announced its plans to switch from using the Xactimate estimating software, stating that it would be adopting a "next-generation property estimation platform with CoreLogic®, a leading property data and analytics driven solutions provider."

33. Beginning in June or July of 2022, Liberty Mutual, at the direction and control of its parent companies, began using the new CoreLogic-backed estimating platform, formerly

known as Symbility®, now known as Cotality® (at times, collectively, "Symbility/Cotality"). By 2023, Liberty Mutual publicly announced that it had fully transitioned to Symbility, which the company described as a "new and improved estimating platform with increased automation" during its annual investor presentation.

34. Liberty Mutual has since been systematically omitting such sales taxes from the O&P calculation. Instead, Liberty Mutual has been calculating O&P before such taxes—i.e., without applying 10% for overhead and 10% for profit to sales taxes—resulting in lower payments to its insureds. *See* Figs. 3-5.

Safeco Insurance

**Safeco Insurance Company**
PO Box 5014
Scranton, PA 18505-5014
Fax: (888) 268-8840

| Description | Quantity | Unit Price | Per | Total O&P | Total Taxes | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|---|
| **ESTIMATE:** Structure — In progress | | | | | Claim [redacted] | | | |
| **HOUSEWRAP / INSULATION** | | | | | | | | |
| **SIDING ITEMS** | | | | | | | | |
| 29 Clean - Pressure/Power Wash Exterior | 3,497.07 | $0.58 | SF | $405.66 | $13.16 | $2,447.11 | $0.00 | $2,447.11 |
| 30 Prime & Paint - Siding | 3,430.53 | $2.11 | SF | $1,447.68 | $77.50 | $8,763.60 | $0.00 | $8,763.60 |
| 31 Prime & Paint - Trim, Corner, Exterior | 32.00 | $1.71 | LF | $10.94 | $0.38 | $66.04 | $0.00 | $66.04 |
| **PAINT/STAIN ITEMS** | | | | | | | | |
| **DOOR & WINDOW ACCESSORIES** | | | | | | | | |
| 32 Remove - Window Beading, Vinyl | 152.00 | $2.64 | LF | $80.26 | $0.00 | $481.54 | $0.00 | $481.54 |
| 33 Replace - Window Beading, Vinyl | 152.00 | $4.61 | LF | $140.14 | $13.97 | $854.83 | $0.00 | $854.83 |

***Fig. 3***

Safeco Insurance.
A Liberty Mutual Company

**Safeco Insurance Company**
PO Box 5014
Scranton, PA 18505-5014
Fax: (888) 268-8840

| Description | Quantity | Unit Price | Per | Total O&P | Total Taxes | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|---|
| ESTIMATE: Structure — Completed | | | | | | Claim [redacted] | | |
| 21 Replace - Valley Flashing, W-Style, Aluminum | 113.01 | $11.82 | LF | $267.16 | $58.92 | $1,661.86 | $1,246.40 ✓ | $415.46 |
| Includes 5% waste on quantity. | | | | | | | | |
| 22 Rem/Reset - Gutter, K-Style, Aluminum, 5" | 226.72 | $8.73 | LF | $395.86 | $1.80 | $2,376.92 | $0.00 | $2,376.92 |
| 23 Rem/Reset - Downspout, Aluminum, 3"x4" | 223.28 | $4.63 | LF | $206.76 | $6.22 | $1,246.77 | $0.00 | $1,246.77 |
| 24 Paint, 1 Coat - Gutter/Downspout | 450.00 | $1.18 | LF | $106.20 | $11.82 | $649.02 | $486.75 ✓ | $162.27 |

***Fig. 4***

Liberty Mutual. INSURANCE

**Liberty Mutual Insurance**
PO Box 5014
Scranton, PA 18505-5014
Fax: (888) 268-8840

| Description | Quantity | Unit Price | Per | Total O&P | Total Taxes | RC | Depreciation | ACV |
|---|---|---|---|---|---|---|---|---|
| ESTIMATE: Structure — Completed | | | | | | Claim [redacted] | | |
| 15 Crown Molding, Paint Grade, Up to 4" - Replace | 50.88 | $5.19 | LF | $52.82 | $12.02 | $328.90 | $26.32 ✓ | $302.58 |
| Includes 6% waste on quantity. | | | | | | | | |
| 16 Crown Molding, 6" & Under - Prime & Paint | 48.00 | $1.50 | LF | $14.40 | $0.40 | $86.80 | $57.86 ✓ | $28.94 |
| 17 Crown Molding, Caulking | 50.40 | $1.45 | LF | $14.62 | $0.82 | $88.52 | $66.38 ✓ | $22.14 |

***Fig. 5***

35. Each of the examples above is from a different estimate, for a different policyholder. And in each example, for each item, "Total O&P" is calculated *before* sales taxes. For instance, for the item on line 30 in Figure 3, "Total O&P" is $1,447.68, which equates to $3,430.53 (the quantity) * $2.11 (the unit price) = $7,238.41 * 0.2 (20 percent O&P) = $1,447.68. But that omits "Total Taxes," which is $77.50. To correctly calculate Total O&P, then, one must calculate $3,430.53 (the quantity) * $2.11 (the unit price) + ***$77.50 (taxes)*** = $7,315.92

* 0.2 (20 percent O&P) = $1,463.18. And by omitting taxes from the O&P calculation, Liberty Mutual underpaid this line item by $15.50 ($1,463.18 - $1,447.68).

36. This pattern repeats across all line items for all Class and Subclass Members.

**1. Liberty Mutual's failure to apply O&P on taxes is intentional, willful, and in bad faith.**

37. Liberty Mutual's failure to pay O&P on sales taxes on the Covered Losses pursuant to the Covered Contracts is particularly egregious given that: (1) Liberty Mutual drafted the contracts using standard policy forms tailored to each state through amendatory endorsements; (2) Liberty Mutual uses estimating software, Symbility/Cotality, that makes it easy for it to correctly apply O&P to sales taxes; and (3) before June or July of 2022, Liberty Mutual paid O&P on taxes.

38. In particular, Liberty Mutual has issued other residential and commercial insurance policies that address how O&P is to be paid, so if it wanted to draft policies that permitted it to omit O&P on sales taxes, it could.

39. The Symbility/Cotality estimating software includes an option for Liberty Mutual to apply O&P to sales taxes.

40. Liberty Mutual has a policy or practice of choosing not to use the software's option to apply O&P to sales taxes.

41. Worse, on or around June 17, 2024, the software used by Liberty Mutual, Symbility/Cotality, was updated to make it even easier for O&P to be applied to taxes. Despite that change, Liberty Mutual has persisted in its policy and practice of not applying O&P to taxes in calculating its payment obligations.

**2. Other insurance companies apply O&P to taxes.**

42. Meanwhile, other insurance companies apply O&P to sales taxes, per the industry custom, standard, and tradition.

43. For example, the following is a recent estimate from State Farm:

**State Farm**

[redacted] [redacted]

| | | | | |
|---|---|---|---|---|
| Insured: | [redacted] | | Estimate: | [redacted] |
| Property: | [redacted] | | Claim Number: | [redacted] |
| | | | Policy Number: | [redacted] |
| Cellular: | [redacted]-[redacted] | | Price List: | TXSA28_MAR25 |
| Type of Loss: | Hail | | | Restoration/Service/Remodel |
| Deductible: | $4,959.00 | | | |
| Date of Loss: | 3/23/2025 | | | |
| Date Inspected: | 4/24/2025 | | | |

**Summary for Coverage A - Dwelling - 35 Windstorm and Hail**

| | |
|---|---|
| Line Item Total | 77,304.56 |
| Material Sales Tax | 2,506.94 |
| Cleaning Mtl Tax | 0.03 |
| Subtotal | 79,811.53 |
| General Contractor Overhead | 7,981.23 |
| General Contractor Profit | 7,981.23 |
| Cleaning Sales Tax | 7.57 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 95,781.56 |
| Less Deductible | (4,959.00) |
| Net Payment | $90,822.56 |

*Fig. 6*

**State Farm**

[redacted] [redacted]

| | | | |
|---|---|---|---|
| Insured: | [redacted] | Estimate: | [redacted] |
| Property: | | Claim Number: | |
| | | Policy Number: | |
| Cellular: | | Price List: | COCS28_AUG18 |
| Type of Loss: | | | Restoration/Service/Remodel |
| Deductible: | $4,480.00 | | |
| Date of Loss: | 8/6/2018 | | |
| Date Inspected: | 8/21/2018 | | |

**Summary for Coverage A - Dwelling - 35 Windstorm and Hail - HL**

| | |
|---|---|
| Line Item Total | 148,211.16 |
| Material Sales Tax | 3,583.56 |
| Subtotal | 151,794.72 |
| General Contractor Overhead | 7,589.76 |
| General Contractor Profit | 7,589.76 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 166,974.24 |
| Less Depreciation (Including Taxes) | (23,576.97) |
| Less General Contractor Overhead & Profit on Recoverable & Non-recoverable Depreciation | (2,357.76) |
| Less Deductible | (4,480.00) |
| Net Actual Cash Value Payment | $136,559.51 |

***Fig. 7***

44. The following is a recent estimate from Travelers:

TRAVELERS

**Summary for Dwelling**

**Summary for All Items**

| | |
|---|---|
| Line Item Total | 124,342.14 |
| Material Sales Tax | 2,987.97 |
| Cleaning Mtl Tax | 0.69 |
| Overhead | 12,733.18 |
| Profit | 12,733.18 |
| Cleaning Sales Tax | 37.26 |
| **Replacement Cost Value** | **$152,834.42** |
| Less Depreciation | (42,482.86) |
| **Actual Cash Value** | **$110,351.56** |
| Less Deductible | (58,509.52) |
| Less Prior Payment(s) | (45,292.92) |
| **Net Claim Remaining** | **$6,549.12** |

***Fig. 8***

45. The following is a recent estimate from USAA:

Price List: COPU8X_JUL23
Restoration/Service/Remodel

**Summary for Dwelling**

| | |
|---|---|
| Line Item Total | 53,775.40 |
| Material Sales Tax | 1,020.98 |
| Subtotal | 54,796.38 |
| Overhead | 5,479.73 |
| Profit | 5,479.73 |
| **Replacement Cost Value** | **$65,755.84** |
| Less Depreciation | (9,920.99) |
| **Actual Cash Value** | **$55,834.85** |
| Less Deductible | (6,500.00) |
| Less Prior Payment(s) | (43,805.72) |

USAA Confidential

***Fig. 9***

46. The following is a recent estimate from American Family:

**Summary for Coverage A - Dwelling**

| | |
|---|---|
| Line Item Total | 1,450,332.96 |
| Material Sales Tax | 62,780.53 |
| Subtotal | 1,513,113.49 |
| Overhead | 149,608.61 |
| Profit | 149,608.61 |
| **Replacement Cost Value** | **$1,812,330.71** |
| Less Depreciation | (380,229.91) |
| **Actual Cash Value** | **$1,432,100.80** |
| Less Deductible | (1,000.00) |
| **Net Claim** | **$1,431,100.80** |

***Fig. 10***

47. As each of the above examples shows, other insurance companies calculate O&P on the total cost of the project, incorporating sales taxes in that total cost as a matter of course.

**3. Liberty Mutual breached its Covered Contract with the McCombs.**

48. The McCombs purchased a residential insurance policy from Liberty Mutual which provided coverage for certain losses to a dwelling and other structures located at 19063 E Bellewood Drive, Aurora, CO 80015 ("the Property"). The Property was insured under Safeco Policy No. OY8001583.

49. The McCombs' policy is a Covered Contract. As relevant here, the policy requires Liberty Mutual to pay the McCombs using the RCLD Methodology. The policy defines, in pertinent part, "ACV" as follows:

> When damage to property is economically repairable, actual cash value shall mean the cost of materials and labor that would be necessary to repair the damage, less reasonable deduction for wear and tear, deterioration, and obsolescence.

50. The subject policy defines "Replacement cost" as follows:

> (1) In case of loss or damage to buildings, replacement cost means the cost, at the time of the loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

51. The policy does not explicitly address, define, limit, or discuss O&P.

52. The policy's "Loss Settlement" provision provides:

> "(3) If the cost to repair or replace is $1,000 or more, we will pay the difference between actual cash value and replacement cost only when the damaged or destroyed property is repaired or replaced."

53. On or about May 10, 2023, the McCombs suffered a covered loss to the Property. They timely submitted a property damage claim to Liberty Mutual requesting payment for their covered structural property loss.

54. Liberty Mutual acknowledged their claim and assigned it Claim No. 056758977-01. Liberty Mutual determined that the McCombs had sustained a covered loss to the Property.

55. Liberty Mutual initially paid the McCombs an ACV payment of $22,500.74, after applying the policy's deductible using the RCLD Methodology.

56. By September 9, 2024, after the McCombs completed repairs to the Property, Liberty Mutual sent additional payments to the McCombs totaling $31,887.59, after applying the policy's deductible, purporting to represent the RCV of the loss. The check was accompanied by an RCV estimate prepared using the Symbility® estimating platform.

57. Liberty Mutual's written explanation of benefits paid showed payments for labor, materials, applicable sales taxes, and for O&P. It thus determined those expenses were compensable components of the McCombs' loss.

58. However, a close examination of the estimate showed that Liberty Mutual calculated O&P before applying it to sales taxes, in breach of the policy's Loss Settlement provision and its definitions of ACV and "Replacement cost," which require payment of the ACV and RCV using the RCLD Methodology.

59. For example, the below estimate includes a line item for steel gutters. *See* Fig. 11. The quoted replacement cost is $3,117.02. However, that amount excludes sales taxes from O&P. The correct replacement cost of the gutters, including O&P on taxes, is $3,132.31—a difference of $15.29.

| GUTTERS / DOWNSPOUTS / FASCIA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 15 Prime & Paint - Fascia, Up to 6" | 286.23 | $2.00 | LF | $114.50 | $3.20 | $690.16 | $0.00 | $690.16 |
| 16 Remove - Gutter, K-Style, Galvanized Steel, 5" | 195.71 | $2.03 | LF | $79.46 | $0.00 | $476.75 | $0.00 | $476.75 |
| 17 Replace - Gutter, K-Style, Galvanized Steel, 5" | 205.50 | $12.33 | LF | $506.76 | $76.44 | $3,117.02 | $0.00 | $3,117.02 |

***Fig. 11***

60. Applying these corrections across the entire estimate, Liberty Mutual's failure to apply O&P to sales taxes in its ACV and RCV payments to the McCombs not only failed to comport with the policy's mandated ACV and Replacement cost definitions, but also resulted in an underpayment to the McCombs of $42.09. And, based on publicly available information, including Liberty Mutual's market share, the rate of homeownership insurance, and annual claim

frequency, Plaintiffs estimate that the total underpayment to Class and Subclass members is as much as $10 million per year.

### C. Post-filing developments

61. After the initial filing of this action, Liberty Mutual, through counsel, purported to demand that Plaintiffs submit to an "appraisal." An appraisal is a mechanism for resolving factual disputes about the value of a given loss. It is not a mechanism for resolving the core issue in this action, which is fundamentally a legal question about contract interpretation of defined terms—ACV and/or RCV, and specifically whether the Covered Contracts require Liberty Mutual to calculate O&P before or after taking sales tax into consideration when paying the ACV and/or RCV of Covered Losses. In fact, the applicable appraisal clause in the policy provides, "In no event will an appraisal be used for the purpose of interpreting any policy provision, determining causation or determining whether any item or loss is covered under this policy." Indeed, Plaintiffs are not aware of any state in which an appraiser would be lawfully permitted to even decide that question. As such, Liberty Mutual's attempt to require that Plaintiffs submit to an appraisal is a transparent attempt to defeat this class action, rather than a good-faith effort to engage in the appraisal process.

## V. ALTER EGO ALLEGATIONS

62. For all purposes relevant to this action, all Defendants are alter egos of each other, and ultimately of one of LMIC, LM Group, LMHC-MA, or LM Holding Company.

63. LMIC, LM Group, LMHC-MA, or LM Holding Company controls the board of directors of all of their subsidiary companies, as well as their management, and there is significant overlap between the board and management of the subsidiary insurance companies and the board and management of LMIC, LM Group, LMHC-MA, or LM Holding Company.

Indeed, Safeco currently does not even have a management team separate from LMIC, LM Group, LMHC-MA, or LM Holding Company.

64. Most if not all of LMIC, LM Group, LMHC-MA, or LM Holding Company's subsidiary insurance companies, including Safeco, have no employees of their own.

65. LM Group or LMIC furnishes the following services to its subsidiary insurance companies, including Safeco: risk underwriting, claims processing, claims adjustments, policyholder services, contract management and administration, office space, supplies, equipment, telephone and wire services, and the use of computers and similar machines and services of personnel employed by LMIC and LM Group. Safeco performs none of these services itself.

66. The claims handling process of most if not all of LMIC, LM Group, LMHC-MA, or LM Holding Company's subsidiary insurance companies, including Safeco, is handled by one of their other subsidiaries, often LM Group or LMIC.

67. None of LMIC, LM Group, LMHC-MA, or LM Holding Company's subsidiary insurance companies, including Safeco, are permitted to set claims handling policies, processes, procedures, or practices separate from those set by LMIC, LM Group, LMHC-MA, or LM Holding Company.

68. For losses suffered by their subsidiary insurance companies, LMIC, LM Group, LMHC-MA, or LM Holding Company absorbs significantly more of the loss than their subsidiary insurance companies themselves. For example, for every dollar of loss incurred on a Safeco policy, Safeco absorbs only 6 percent of the loss, while LMIC absorbs 50 percent.

69. The claims handling policy, process, and practice at issue here—deliberately, intentionally, and in bad faith omitting sales taxes from the O&P calculation—was created,

authored, and mandated by one of LMIC, LM Group, LMHC-MA, or LM Holding Company, as an enterprise-wide directive, policy, manual, guideline, algorithm, or some combination thereof, to be followed by all of their subsidiary insurance companies. None of their subsidiary insurance companies, including Safeco, was permitted to deviate from that policy, process, or practice, and none in fact did.

70. LMIC, LM Group, LMHC-MA, or LM Holding Company did so despite knowing its subsidiaries' contracts, including Safeco's, did not permit omitting sales taxes from the O&P calculation, and despite knowing that doing so was contrary to long-standing industry custom, practice, and standards.

71. LMIC, LM Group, LMHC-MA, or LM Holding Company did so to increase their enterprise-wide profits.

## VI. CLASS ACTION ALLEGATIONS

### A. Class definition.

72. Pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated. Plaintiffs propose the following class definition:

> All Liberty Mutual property insurance policyholders or their lawful assignees: (a) whose policy is a Covered Contract; (b) whose claim for loss or damage was determined by Liberty Mutual to be a Covered Loss and eligible for O&P; (c) whose claim was paid by Liberty Mutual without going through appraisal, without exhausting their policy limits, and without executing a release; (d) whose payment was based on a final estimate that calculated O&P before applicable sales taxes rather than after applicable sales taxes; (e) whose last payment was made within the applicable limitations period; and (f) whose Covered Contracts are governed by the laws of the following states (the "Class"), each of which comprises a Subclass:
>
> **Alabama Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Alabama.

**Arizona Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Arizona.

**Arkansas Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Arkansas.

**Colorado Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Colorado.

**Florida Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Florida.

**Illinois Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Illinois.

**Indiana Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Indiana.

**Kansas Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Kansas.

**Kentucky Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Kentucky.

**Mississippi Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Mississippi.

**Missouri Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Missouri.

**North Carolina Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of North Carolina.

**Ohio Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Ohio.

**Texas Subclass:** All Class and Subclass members whose Covered Contracts are governed by the laws of Texas.

73. Plaintiffs reserve the right to amend the Class and Subclass definitions.

**B. The Class and Subclasses satisfy Rule 23.**

**1. Numerosity**

74. There are conservatively hundreds of thousands of Class and Subclass members, such that joinder of all members is impracticable.

**2. Commonality**

75. Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions affecting only individual Class and Subclass members. The questions of law and fact common to the Class and each Subclass include, but are not limited to:

- Whether the Covered Contracts' definition of ACV and/or RCV requires Defendants to calculate O&P after applicable sales taxes;
- Whether Defendants have a policy or practice of improperly failing to apply O&P to applicable taxes in violation of the Covered Contracts;
- Whether Defendants' conduct constitutes a breach of the Covered Contracts under the applicable state law governing each Subclass;
- Whether Defendants' conduct constitutes bad faith or a violation of the applicable state insurance or consumer protection statutes governing each Subclass; and
- Whether, through the foregoing practices, Defendants caused and will continue to cause harm to the Class and each Subclass.

**3. Typicality**

76. Plaintiffs' claims are typical of the claims of all Class and Subclass members, as they are all similarly affected by Defendants' policy and practice of improperly failing to apply O&P to sales taxes. Plaintiffs' claims arise from the same underlying facts and are based on the same factual and legal theories. The McCombs' Covered Contract is materially identical to those of all other Class and Subclass members in that it does not explicitly permit Defendants to omit sales taxes from the O&P calculation.

**4. Adequacy of representation**

77. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class and each Subclass. Plaintiffs' interests do not conflict with the interests of any Subclass they seek to represent. Plaintiffs have retained counsel who are competent and experienced in class action and insurance litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the members of the Class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class while recognizing the risks associated with litigation. Plaintiffs reserve the right to have unnamed Class and Subclass members join them in seeking to be class representatives.

**5. Predominance and superiority**

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed members of the Class in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the Class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice.

79. Questions of law or fact common to Plaintiffs and members of the Class, including those identified above, predominate over questions affecting only individual members (if any). Each Subclass member's claim arises from the same uniform Symbility/Cotality settings, the same corporate policy of not applying O&P to taxes, and materially identical Covered Contracts containing ACV and/or RCV definitions which require payment using the RCLD Methodology that do not contain language on the application of O&P to taxes. The

damages for each Class Member are calculable from Defendants' own Symbility/Cotality data by comparing the O&P that was paid to the O&P that should have been paid had it been calculated after taxes. This mechanical, data-driven calculation further supports predominance.

80. In contrast, individual litigation would exacerbate delay and increase expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact. A class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection of the rights of Plaintiffs and members of the Class.

81. Plaintiffs seek to extend the statute of limitations for themselves and the Class to the fullest extent permissible under the *American Pipe* doctrine.

## VII. CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT

82. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

83. This Count is brought on behalf of the Class and each State Subclass. The substantive law of each Subclass's respective state governs the breach of contract claims of that Subclass's members. The breach of contract claims of each Subclass arise from materially identical Covered Contracts which define ACV and/or RCV in a manner requiring payment of Covered Losses under the RCLD Methodology, but are devoid of explicit language on how O&P is applied, and the same uniform conduct by Liberty Mutual in paying the ACV and RCV of covered structural losses that include O&P, and are therefore suitable for class-wide adjudication. Additionally, the elements of each Subclass's contract claims are substantively identical: (1) the existence of a valid, binding contract issued by Liberty Mutual; (2) the plaintiff's performance

under the contract; (3) the defendant's breach of the contract; and (4) damages from the defendant's breach.

**1. Alabama**

84. Defendants entered into Covered Contracts with the Alabama Subclass members. Under Alabama law, a breach of contract requires: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. *Dupree v. Peoples South Bank*, 308 So.3d 484, 490 (Ala. 2020) (citation omitted). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached their contractual obligations to pay the ACV and, if applicable, the RCV of the Alabama Subclass members' claims by unlawfully and systematically calculating O&P before sales taxes, resulting in the underpayment of the Alabama Subclass members' claims.

**2. Arizona**

85. Defendants entered into Covered Contracts with the Arizona Subclass members. Under Arizona law, a breach of contract requires: (1) the existence of a contract; (2) breach of that contract; and (3) the resulting damages. *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013) (citation omitted). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached their contractual obligations to pay the ACV and, if applicable, the RCV of the Arizona Subclass

members' claims by unlawfully and systematically calculating O&P before sales taxes, resulting in the underpayment of the Arizona Subclass members' claims.

**3. Arkansas**

86. Defendants entered into Covered Contracts with the Arkansas Subclass members. Under Arkansas law, a breach of contract requires: (1) the existence of a valid and enforceable contract between the plaintiff and defendant; (2) the obligation of defendant thereunder; (3) a violation by the defendant; and (4) damages resulting to the plaintiff from the breach. *Ark. Dev. Fin. Auth. v. Wiley*, 611 S.W.3d 493, 498 (Ark. 2020). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Arkansas Subclass members' claims.

**4. Colorado**

87. Defendants entered into Covered Contracts with the Colorado Subclass members. Under Colorado law, a breach of contract requires: (1) the existence of a contract; (2) the plaintiff's performance of the contract or justification for nonperformance; (3) the defendant's failure to perform the contract; and (4) the plaintiff's damages as a result of the defendant's failure to perform the contract. *Bd. of Governors of Colo. State Univ. v. Alderman*, 563 P.3d 1205, 1212 (Colo. 2025). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts

by systematically calculating O&P before sales taxes, resulting in the underpayment of the Colorado Subclass members' claims.

**5. Florida**

88. Defendants entered into Covered Contracts with the Florida Subclass members. Under Florida law, a breach of contract requires: (1) a valid contract; (2) a material breach; and (3) damages. *In re Standard Jury Instructions—Contracts and Business Cases*, 116 So.3d 284, 306 (Fla. 2013). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Florida Subclass members' claims.

**6. Illinois**

89. Defendants entered into Covered Contracts with the Illinois Subclass members. Under Illinois law, a breach of contract requires: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach by the defendant; and (4) damages caused by that breach. *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 877 (Ill. 2022). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Illinois Subclass members' claims.

**7. Indiana**

90. Defendants entered into Covered Contracts with the Indiana Subclass members. Under Indiana law, a breach of contract requires: (1) the existence of a contract; (2) the defendant's breach thereof; and (3) damages. *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (citation omitted). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Indiana Subclass members' claims.

**8. Kansas**

91. Defendants entered into Covered Contracts with the Kansas Subclass members. Under Kansas law, a breach of contract requires: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Kansas Subclass members' claims.

**9. Kentucky**

92. Defendants entered into Covered Contracts with the Kentucky Subclass members. Under Kentucky law, a breach of contract requires: (1) the existence of a contract; (2) breach of the contract; and (3) damages as a result of the breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Kentucky Subclass members' claims.

**10. Mississippi**

93. Defendants entered into Covered Contracts with the Mississippi Subclass members. Under Mississippi law, a breach of contract requires: (1) the existence of a valid and binding contract; and (2) a showing that the defendant has broken, or breached it. *Maness v. K & A Enters. of Miss., LLC*, 250 So.3d 402, 414 (Miss. 2018). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Mississippi Subclass members' claims.

**11. Missouri**

94. Defendants entered into Covered Contracts with the Missouri Subclass members. Under Missouri law, a breach of contract requires: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the

contract by the defendant; and (4) damages suffered by the plaintiff. *Bell v. Shelter Gen. Ins. Co.*, 701 S.W.3d 614, 618 (Mo. 2024). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Missouri Subclass members' claims.

**12. North Carolina**

95. Defendants entered into Covered Contracts with the North Carolina Subclass members. Under North Carolina law, a breach of contract requires: (1) the existence of a valid contract and (2) breach of the terms of the contract. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019) (citation omitted). For the avoidance of doubt, the North Carolina Subclass includes only those North Carolina policyholders whose policies are Covered Contracts—i.e., policies that do not contain any provision that explicitly addresses, defines, limits, or discusses overhead and profit. North Carolina policyholders whose policies contain endorsements that explicitly list "overhead and profit" as a component of the estimated cost to repair or replace damaged property are excluded from the North Carolina Subclass and the Class. The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the North Carolina Subclass members' claims.

**13. Ohio**

96. Defendants entered into Covered Contracts with the Ohio Subclass members. Under Ohio law, a breach of contract requires: (1) the existence of a contract; (2) the failure without legal excuse of the other party to perform when performance is due; and (3) damages or loss resulting from the breach. *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Ohio Subclass members' claims.

**14. Texas**

97. Defendants entered into Covered Contracts with the Texas Subclass members. Under Texas law, a breach of contract requires proof that: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas Co., Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). The Covered Contracts' definition of ACV and/or RCV requires Defendants to pay covered structural damages claims initially, on an ACV basis, then if repairs are completed, on an RCV basis using the RCLD Methodology, both of which, as set forth above, include O&P calculated after applicable sales taxes. Defendants breached those contracts by systematically calculating O&P before sales taxes, resulting in the underpayment of the Texas Subclass members' claims.

**15. Damages (all Subclasses).**

98. No provision in any Covered Contract allows Defendants to exclude the application of O&P to applicable sales taxes.

99. Defendants' actions in breaching their contractual obligations to Plaintiffs and Class and Subclass members benefitted, and continue to benefit, Defendants. Likewise, Defendants' actions damaged, and continue to damage, Plaintiffs and other Class and Subclass members by denying them the full measure of compensation for their covered damages.

100. Defendants' actions in breaching their contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and other Class and Subclass members.

101. In light of the foregoing, Plaintiffs and other Class and Subclass members are entitled to recover damages sufficient to make them whole for all amounts Defendants unlawfully withheld from their ACV and/or RCV payments by failing to apply O&P to applicable state and local taxes, including prejudgment interest for all periods of withholding as may be allowed by law.

102. Plaintiffs and other Class and Subclass members seek any equitable relief as may be permitted under applicable state law to remedy the ongoing breaches of contract.

**COUNT II – VIOLATION OF STATE CONSUMER PROTECTION LAWS**

103. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104. This Count is brought on behalf of the State Subclass of each state addressed below under the consumer protection statute of the respective state.

**1. Arizona**

105. Defendants' conduct as described herein violates the Arizona Consumer Fraud Act, A.R.S. § 44-1521 et seq. Defendants engaged in unfair acts or practices in connection with the sale and administration of insurance services by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**2. Arkansas**

106. Defendants' conduct as described herein violates the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 et seq. Defendants engaged in unconscionable trade practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**3. Colorado**

107. Plaintiffs and the Colorado Subclass members are actual consumers or successors in interest to actual consumers of Defendants' insurance services as defined in C.R.S. § 6-1-113(1)(a), (b).

108. Defendants' conduct as described herein violates C.R.S. § 6-1-105(1)(rrr) of Colorado's Consumer Protection Act. Defendants engaged in unfair and unconscionable conduct by knowingly, recklessly, and unlawfully underpaying the ACV and/or RCV of Plaintiffs' and Class and Subclass members' losses by:

- failing to apply O&P to applicable taxes;
- falsely representing to Plaintiffs and Class and Subclass members that Defendants properly adjusted the claims per their policies' terms under the RCLD Methodology when in fact they had not;
- falsely representing to Plaintiffs and Class and Subclass members that the ACV and/or RCV payment issued by Defendants accurately represented the

actual cash value and/or replacement cost value of the loss when in fact it did not; and

- failing to assume all reasonable costs sufficient to pay for the Plaintiffs' and Colorado Subclass members' repairs, in violation of C.R.S. § 10-4-120(3)(e).

109. Defendants engaged in these unfair trade practices in the course of their business, vocation, or occupation.

110. Defendants' conduct described herein significantly impacts the public as actual or potential consumers of Defendants' goods, services or property because, among other reasons, there is a great disparity in bargaining power between Defendants and the consumers affected by Defendants' post-sale, insurance claims handling conduct; Defendants are much more sophisticated in adjusting and paying insurance claims than consumers; and Defendants' unfair trade practices have directly affected consumers in the past and will continue to affect consumers in the future.

111. Plaintiffs and Colorado Subclass members were injured as a result of Defendants' unfair trade practices.

**4. Florida**

112. Defendants' conduct as described herein violates the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Defendants engaged in unfair and unconscionable acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**5. Illinois**

113. Defendants' conduct as described herein violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. Defendants engaged in unfair acts and

practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**6. Kansas**

114. Defendants' conduct as described herein violates the Kansas Consumer Protection Act, K.S.A. § 50-623 et seq. Defendants engaged in unconscionable acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**7. Kentucky**

115. Defendants' conduct as described herein violates the Kentucky Consumer Protection Act, K.R.S. § 367.110 et seq. Defendants engaged in unfair acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**8. Missouri**

116. Defendants' conduct as described herein violates the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 et seq. Defendants engaged in unfair practices in connection with insurance services by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**9. North Carolina**

117. Defendants' conduct as described herein violates the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq. Defendants engaged in unfair acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes. Class and Subclass members are entitled to treble damages under N.C. Gen. Stat. § 75-16.

**10. Ohio**

118. Defendants' conduct as described herein violates the Ohio Unfair, Deceptive, or Unconscionable Acts or Practices Act, Ohio Rev. Code § 1345.01 et seq. Defendants engaged in unfair and/or unconscionable acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**11. Texas**

119. Defendants' conduct as described herein violates the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 et seq. Defendants engaged in unconscionable acts and practices by systematically underpaying ACV and/or RCV claims through the failure to apply O&P to applicable taxes.

**12. Damages (all Subclasses – Count II).**

**120.** As a result of Defendants' conduct, Plaintiffs and Class and Subclass members have suffered damages, including but not limited to the difference between the O&P amounts they were paid and the O&P amounts they should have been paid had O&P been calculated after applicable taxes, together with any statutory damages, penalties, treble damages, attorneys' fees, and costs available under the applicable state consumer protection statutes.

**COUNT III – BAD FAITH**

121. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122. This Count is brought on behalf of the State Subclass of each state addressed below under the bad faith insurance law, statutory insurance remedy, or analogous statutory scheme of the respective state, as set forth below.

**1. Alabama**

123. Under Alabama law, to prevail on a bad faith claim, the insured must establish: (1) an insurance contract between the parties and a breach thereof by the defendant; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason. *Nucor Steel Tuscaloosa, Inc. v. Zurich Am. Ins. Co.*, 343 So.3d 458, 474 (Ala. 2021). Alternatively, the insured may prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

124. Defendants entered into Covered Contracts with the Alabama Subclass members and breached those contracts by systematically failing to apply O&P to applicable taxes. Defendants intentionally refused to pay the full amount of O&P owed. There was no reasonably legitimate or arguable reason for this refusal: the Covered Contracts are silent on O&P, Liberty Mutual's own explanations acknowledge that O&P is to be calculated after taxes, and the industry standard requires O&P on taxes. Defendants knew there was no legitimate or arguable reason for their refusal, or, at minimum, intentionally failed to determine whether one existed.

**2. Arizona**

125. Under Arizona law, to prove bad faith, the insured must show: (1) the insurer acted unreasonably toward its insured; and (2) the insurer acted knowing it was acting unreasonably or acted with such disregard that such knowledge may be imputed to it. *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 530 (Ariz. Ct. App. 2006).

126. Defendants acted unreasonably by systematically failing to apply O&P to applicable taxes under the Covered Contracts, contrary to the Covered Contracts' terms, Liberty Mutual's own stated interpretation of its obligations, and industry standards. Defendants knew or

acted with such reckless disregard that knowledge of unreasonableness may be imputed to them, particularly given that Symbility explicitly offered the option to apply O&P to taxes and Defendants deliberately chose not to use it.

**3. Arkansas**

127. Under Arkansas law, the plaintiff must establish that the insurance company engaged in affirmative misconduct that was dishonest, malicious, or oppressive—conduct carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge. *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Guyer*, 386 S.W.3d 682, 691-92 (Ark. Ct. App. 2011).

128. Defendants' systematic and deliberate failure to apply O&P to applicable taxes constitutes affirmative misconduct that is malicious and oppressive. Defendants knowingly devised and implemented a scheme to underpay claims on a mass basis to increase their own profits at the expense of their insureds.

**4. Colorado**

129. Sections 10-3-1115(1) and (2), C.R.S., forbid insurers like Defendants from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of any first-party claimant.

130. Plaintiffs and Colorado Subclass members are first-party claimants within the meaning of C.R.S. § 10-3-1115(1)(b).

131. The failure to apply O&P to applicable taxes under the Covered Contracts, when Defendants' own documents, communications, and the industry standard all require O&P to be calculated after taxes, constitutes an unreasonable delay or denial within the meaning of C.R.S. § 10-3-1115(2).

132. Plaintiffs and Colorado Subclass members therefore bring this claim to recover damages awardable under C.R.S. § 10-3-1116(1), separate from and in addition to those remedies and damages awardable under any other claim for relief.

133. Colorado law also provides for a common law bad faith claim, under which the insured must prove: (1) the insurer acted unreasonably under the circumstances; and (2) the insurer either knowingly or recklessly disregarded the validity of the insured's claim. *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. Ct. App. 2010).

134. Defendants acted unreasonably by systematically failing to apply O&P to applicable taxes under the Covered Contracts, when their own documents, communications, and the industry standard all require O&P to be calculated after taxes. Defendants knowingly or recklessly disregarded the validity of Subclass members' claims by deliberately configuring their Symbility software to not apply O&P to taxes, persisting in this practice even after Symbility made it easier to apply O&P to taxes. The McCombs' claim was not fairly debatable: Liberty Mutual's own formula states O&P is calculated after taxes, and the Covered Contract is silent on O&P, meaning there is no contractual basis for omitting O&P from taxes.

**5. Illinois**

135. Illinois provides a statutory remedy under 215 ILCS 5/155, which permits the recovery of attorneys' fees and costs when an insurer's delay or denial of a claim is vexatious and unreasonable.

136. Defendants' systematic failure to apply O&P to applicable taxes under the Covered Contracts constitutes vexatious and unreasonable conduct. The Illinois Subclass members are entitled to recover attorneys' fees and costs under 215 ILCS 5/155.

**6. Indiana**

137. The Indiana Supreme Court has recognized a "cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993). "The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Id.*

138. Defendants made an unfounded partial refusal to pay the full O&P owed under the Covered Contracts by systematically calculating O&P before sales taxes. Defendants caused an unfounded delay in making full payment. Defendants exercised an unfair advantage by leveraging the complexity and opacity of their estimating software to pressure insureds into accepting underpayments.

**7. Kansas**

139. Kansas does not recognize a common-law bad faith insurance tort. *Spencer v. Aetna Life & Cas. Ins. Co.*, 611 P.2d 149, 158 (Kan. 1980). However, K.S.A. 40-256 permits the recovery of attorneys' fees when an insurer denies a claim or refuses to pay without just cause or excuse and judgment is entered against the insurer.

140. Defendants' systematic failure to apply O&P to applicable taxes under the Covered Contracts was without just cause or excuse. The Covered Contracts are silent on O&P; Liberty Mutual's own formula calculates O&P after taxes; and the industry standard requires it. The Kansas Subclass members are entitled to recover attorneys' fees under K.S.A. 40-256.

**8. Kentucky**

141. Under Kentucky law, the elements of a bad faith claim are: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 26 (Ky. 2017).

142. Defendants were obligated to pay O&P on applicable taxes under the Covered Contracts. Defendants lacked any reasonable basis for refusing to do so: the Covered Contracts do not authorize the exclusion of taxes from the O&P calculation, Liberty Mutual's own documents acknowledge that O&P is calculated after taxes, and the industry standard requires it. Defendants knew there was no reasonable basis for their refusal, or acted with reckless disregard for whether one existed.

**9. Mississippi**

143. Under Mississippi law, the plaintiff bears the burden of proving that the insurer lacked a legitimate or arguable basis for denying the claim or that it committed a willful or malicious wrong or acted with gross and reckless disregard for the insured's rights. *Liberty Ins. Corp. v. Tutor*, 309 So.3d 493, 507 (Miss. Ct. App. 2019).

144. Defendants lacked any legitimate or arguable basis for failing to apply O&P to applicable taxes under the Covered Contracts. Defendants' deliberate scheme to systematically underpay claims by configuring Symbility to exclude taxes from the O&P calculation constitutes willful conduct carried out with gross and reckless disregard for the rights of the Mississippi Subclass members.

**10. North Carolina**

145. Under North Carolina law, to prove bad faith, the plaintiff must prove: (1) a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct. *Defeat the Beat, Inc. v. Underwriters at Lloyd's London*, 669 S.E.2d 48, 55 (N.C. Ct. App. 2008).

146. Defendants recognized that the North Carolina Subclass members' claims were valid and eligible for O&P, yet refused to pay the full O&P owed by calculating it before sales taxes. Defendants acted in bad faith by deliberately configuring their Symbility software to not apply O&P to taxes, knowing that the Covered Contracts do not authorize this practice. Defendants' conduct was aggravating and outrageous in that they devised and implemented a systematic scheme to underpay claims on a mass basis, leveraging opaque software to prevent their insureds from discovering the underpayment, all for the purpose of increasing their own profits.

**11. Ohio**

147. Under Ohio law, an insurer fails to exercise good faith in the processing of a claim where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification. *Ohio Nat'l Life Assur. Corp. v. Satterfield*, 956 N.E.2d 866, 872 (Ohio Ct. App. 2011). Even if an insurance company believes it was justified, its belief may not be arbitrary or capricious, and the denial must be fairly debatable.

148. Defendants' refusal to apply O&P to applicable taxes was not predicated upon circumstances that furnish reasonable justification. The Covered Contracts do not authorize the exclusion of taxes from the O&P calculation. Liberty Mutual's own formula requires O&P after taxes. The industry standard requires O&P on taxes. The issue is not fairly debatable.

Defendants' decision to systematically configure Symbility to not apply O&P to taxes was arbitrary and capricious.

**12. Texas**

149. Under Texas law, the elements of a bad faith claim are: (1) the insurer had no reasonable basis for the denial or delay in payment of a claim; and (2) the insurer knew or should have known of that fact. *Murray v. Allstate Vehicle & Prop. Ins. Co.*, No. 24-1773, 2025 WL 1095098, at *4 (S.D. Tex. Apr. 11, 2025).

150. Defendants had no reasonable basis for failing to apply O&P to applicable taxes under the Covered Contracts. The Covered Contracts are silent on O&P; Liberty Mutual's own formula provides for O&P after taxes; and the industry standard requires it. There is no bona fide coverage dispute: Defendants acknowledged coverage and determined that the Texas Subclass members' claims were eligible for O&P—the only dispute is whether O&P should be calculated before or after sales taxes, and the answer under the Covered Contracts is unambiguous. Defendants knew or should have known that their refusal to apply O&P to taxes was without any reasonable basis.

**13. Damages (all Subclasses – Count III).**

151. As a result of Defendants' bad faith, vexatious, and/or unreasonable conduct, Plaintiffs and Class and Subclass members are entitled to recover all damages available under applicable state law, including but not limited to compensatory damages, consequential damages, statutory penalties, punitive damages (where permitted), attorneys' fees, and costs.

## COUNT IV – DECLARATORY JUDGMENT AND RELIEF

152. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

153. This Count is brought on behalf of Plaintiffs and Subclass members pursuant to the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether further relief is or could be claimed.

154. There exists a legal controversy or uncertainty between Plaintiffs, individually and on behalf of the proposed Class and Subclass members, on one hand, and Liberty Mutual, on the other, regarding their existing rights with respect to the interpretation of defined terms—ACV and, as applicable, RCV—under the Covered Contracts, where, as here, O&P is included as a component of ACV and RCV payment(s) of the Covered Losses, but is not applied to taxes.

155. Plaintiffs seek, individually and on behalf of the proposed Class and Subclass members, a declaration that, under the laws of each of the states set forth in Counts I through III:

a. the applicable Covered Contracts' definition of ACV and/or RCV prohibits Liberty Mutual from omitting sales taxes from O&P as described herein when paying the ACV and/or RCV for covered structural damage losses under Covered Contracts calculated using the RCLD Methodology; and

b. the issue of whether the Covered Contracts require applying O&P to sales taxes in ACV and/or RCV calculations is a question of law requiring the interpretation of the definition of ACV and/or RCV, and therefore, not subject to appraisal.

156. Plaintiffs further seek, individually and on behalf of the proposed Class, any and all other relief available under the law arising out of a favorable declaration.

157. Plaintiffs and members of the proposed Class have suffered and will continue to suffer injuries.

## VIII. PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and others similarly situated, respectfully request that

this Court:

A. Certify the Class and State Subclasses identified herein, or as amended during litigation, appoint Plaintiffs as Class representatives, and appoint their undersigned counsel as Class counsel;

B. Enter a preliminary and permanent injunction and equitable relief against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the policy and practice of calculating O&P before, rather than after, applicable sales taxes;

C. Award damages (including prejudgment interest) to named representatives and certified Class and Subclass members under the terms of their Covered Contracts;

D. Award damages pursuant to the applicable state consumer protection statutes, including actual damages, statutory damages, treble damages (where available), injunctive relief, and attorneys' fees and costs;

E. Award damages for bad faith, vexatious refusal, and/or statutory insurance violations, including compensatory damages, consequential damages, punitive damages (where permitted), statutory penalties, attorneys' fees, and costs;

F. Grant the requested declaratory relief;

G. Award Plaintiffs and the Class their attorneys' fees, costs, and expenses of this action; and

H. Grant such other and further relief as the Court deems necessary and proper.

## IX. JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues so triable.

Date: October 5, 2026

Respectfully submitted,

Emma Lerner Freeman (BBO# 688311)
LERNER FREEMAN LAW PLLC
14 Wall St., 4C
New York, NY 10005
emma@lernerfreemanlaw.com
(413) 221-9033

J. Lindsey Chong
Bryant Paris
FLC LAW
1430 S. Dixie Highway, Suite 317
Coral Gables, FL 33146
jlc@flc-legal.com
(786) 505-5257
bp@flc-legal.com
(305) 874-0750

Times Wang
Charee Woodard
FARRA & WANG PLLC
650 Massachusetts Avenue, NW, Suite 600
Washington, DC 20005
twang@farrawang.com
(202) 505-6227
cwoodard@farrawang.com
(202) 505-6007

Katie Goodrich
Rodney J. Monheit
MOGO, LLC
600 17th St, Ste 2800 S
Denver, CO 80202
katie@mogollc.com
(720) 954-2199
rodney@mogollc.com
(720) 954-2207